**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM<br><br>  Plaintiff,<br><br>  vs.<br><br>ALNYLAM PHARMACEUTICALS INC. AND ALNYLAM U.S., INC.<br><br>  Defendants. | Civil Action No. 1:25-cv-13865-BEM<br><br>JURY TRIAL DEMANDED |

**<u>DEFENDANTS ALNYLAM PHARMACEUTICALS INC. AND ALNYLAM U.S. INC.'S
OPENING CLAIM CONSTRUCTION BRIEF</u>**

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................... 1

II. BACKGROUND ........................................................................................................ 1

III. LEGAL STANDARD ................................................................................................ 3

IV. TERMS FOR CONSTRUCTION............................................................................. 6

  A. "a lipid component" ...................................................................................... 6

  B. "a phospholipid component"........................................................................ 8

  C. "the phospholipid is not a lysophosphatidylcholine or
    lysophosphatidylethanolamine".................................................................. 10

  D. "a neutral charge" ....................................................................................... 12

  E. "liposome" .................................................................................................... 15

    1. The Ordinary and Customary Meaning of "Liposome" ........................... 15

    2. The Use of "Liposome" in the '717 Patent Comports with the
      Ordinary and Customary Meaning............................................................... 16

    3. Plaintiff's Proposed Construction Is Insufficient...................................... 17

  F. "encapsulate the siRNA such that greater than 90% of the liposomes
    encapsulate siRNA........................................................................................ 18

V. CONCLUSION.......................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acufloor, LLC v. EvenTile, Inc.*,
2025 WL 1513766 (Fed. Cir. May 28, 2025) ........................................................5, 9

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
713 F.3d 1090 (Fed. Cir. 2013)..........................................................................4, 5

*Digene Corp. v. Third Wave Techs., Inc.*,
323 F. App'x 902 (Fed. Cir. 2009) ........................................................................8

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009)..............................................................................5

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed. Cir. 1999)................................................................................4

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
535 U.S. 722 (2002)..........................................................................................4, 11

*Imaginal Systematic, LLC v. Leggett & Platt, Inc.*,
805 F.3d 1102 (Fed. Cir. 2015)..............................................................................6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004)..............................................................................6

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
933 F.3d 1345 (Fed. Cir. 2019)....................................................................5, 9, 18

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
355 F.3d 1361 (Fed. Cir. 2004)..............................................................................3

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)..................................................................................3

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)...........................................................................3, 5

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................... *passim*

*SpeedTrack, Inc. v. Amazon.com, Inc.*,
998 F.3d 1373 (Fed. Cir. 2021)..............................................................................5

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996).........................................................................................6

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
    853 F.3d 1272 (Fed. Cir. 2017).......................................................................................3

**Statutes**

35 U.S.C. § 102............................................................................................................11

35 U.S.C. § 103............................................................................................................13

Pursuant to the Scheduling Order, Defendants Alnylam Pharmaceuticals Inc. and Alnylam U.S., Inc. ("Alnylam") submits it Opening Claim Construction Brief regarding the disputed terms of U.S. Patent No. 8,895,717 (the "'717 Patent," Ex. 1[1]).  D.I. 104 (Scheduling Order); D.I. 120-1 (Claim Chart).  Alnylam also submits the Declaration of Steven F. Dowdy (the "Dowdy Decl.") to provide additional technical background.  Ex. 2.

## I.    INTRODUCTION

Alnylam's proposed constructions are consistent with the ordinary and customary meanings of the disputed '717 Patent claim terms at issue.  These constructions, grounded in the '717 Patent's intrinsic record, offer clarity that will assist both the Court and jury in understanding the claims and assessing infringement and validity.  Plaintiff's proposed constructions, taken individually or collectively, fail to provide true meaning to the patent claim terms at issue, and disregard Plaintiff's clear statements to the Patent Office.  Tellingly, most of Plaintiff's proposed constructions leave open significant questions of meaning, which will need to be resolved to determine issues of infringement and validity.  In doing so, Plaintiff's constructions fail to meet the purpose of claim construction – to set the metes and bounds of the patent's claims.  For the reasons discussed below, the Court should adopt Alnylam's proposed constructions.

## II.    BACKGROUND

The '717 Patent issued on November 25, 2014,[2] and is directed to "the delivery of inhibitory nucleic acids, including siNA (e.g., a siRNA) via neutral lipid compositions or

---

[1] All referenced exhibits are attached to the declaration of William G. Gaede, III filed concurrently herewith.

[2] For the purposes of claim construction, Alnylam takes no position whether the Asserted Claims should be entitled to the priority date of the provisional (April 15, 2005) or the PCT filing (April 17, 2006).  As stated by Dr. Dowdy, a person of ordinary skill in the art ("POSA")'s understanding of the claims would be the same regardless of which date was used.  Dowdy Decl., ¶21, n.1.

liposomes." '717 Patent, 1:22-24. Plaintiff asserts Claims 1, 2,[3] 10, and 11 (the "Asserted Claims"). *See* Appendix A attached hereto with the claim language.

As elaborated further in the Dowdy Declaration, in the early 2000s, many researchers were working to develop therapeutics from nucleic acids (i.e., DNA and RNA). Dowdy Decl, ¶21, n.2. Scientists had to develop delivery mechanisms to protect and aid in the delivery of the nucleic acids to the target tissue. *Id.* One approach that had been developed for more traditional drugs was the use of lipids to create liposomes. *Id.*. Lipids are a class of naturally occurring molecules but are also created by scientists. *Id.*, at ¶22. Lipids may be neutral or may carry a charge. *Id.*

Certain lipids, like phospholipids, behave in a particular way in water because they have regions that are hydrophilic (*i.e.*, attracted to the water) and regions that are hydrophobic (*i.e.*, repelled from the water). Dowdy Decl., ¶22. This property of having both hydrophobic and hydrophilic regions is called being amphophilic. *Id.* Because phospholipids are amphoteric, they naturally self-assemble in water to create structures like liposomes. *Id.* In a liposome, the lipids form a bilayer(s) or aggregate, where the hydrophilic regions of the lipids preferentially interact with each other and the water, and the hydrophobic regions of the lipids preferentially interact with each other and attempt to minimize contact with the water. *Id.,* ¶¶24-27. This results in a bubble-like structure known as a liposome where the inner and outer surfaces of the liposome are the hydrophilic regions of the lipid, with the hydrophobic regions buried inside the lipid layer. *Id.* This lipid bubble has water inside of it, often referred to as an aqueous medium or core, and molecules (like small molecule drugs or nucleic acids) can be trapped in liposomes through a process known as encapsulation. *Id.*

---

[3] Except where noted, the language of Claim 1 and Claim 2 is effectively the same.

## III.    LEGAL STANDARD

Claim construction is a question of law for the Court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 997 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) (explaining that a patent is like a deed to property and sets out the "metes and bounds of the property the inventor owns").  It begins and ends with how a POSA would understand the claim language in the context of the patent as a whole as of the effective date of the patent application.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-15 (Fed. Cir. 2005) (*en banc*).  While claim terms are generally given their ordinary and customary meaning, that meaning is not "the meaning of the term in the abstract," but rather the meaning to a POSA after reading the patent's entire intrinsic record, including the claims, specification, and prosecution history.  *Id.* at 1321.

The Court must look at the ordinary and customary meaning in the context of the intrinsic evidence of record, *i.e.*, the language of the claims, the patent's specification, and the patent's prosecution history.  *Id.* at 1315-1317.  "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."  *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004).  "'The context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning' of terms in a claim.*"  Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 (Fed. Cir. 2017).  Claims also "do not stand alone" and should be construed in light of the specification "with a view to ascertaining the invention."  *Phillips*, 415 F.3d at 1315-16.

The prosecution history also provides "evidence of how the PTO and the inventor understood the patent" and, where present, limits claim scope through disclaimer or disavowal.  *Id.* at 1317.  Statements made to secure allowance, particularly those distinguishing prior art, are binding and must be given effect.  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-24

3

(Fed. Cir. 2003).  This principle reflects the notice function of the prosecution history intrinsic record: the public is entitled to rely on the patentee's representations to the Patent Office to secure the patent's allowance.  *Phillips*, 415 F.3d at 1317.

Several doctrines underscore the prosecution history's importance.  *First*, prosecution history estoppel prevents a patentee from recapturing, through claim construction or the doctrine of equivalents, invention subject matter that was surrendered during prosecution to obtain the patent's allowance.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733-34 (2002).  Estoppel arises when an applicant narrows claim scope, whether by amendment or argument, for reasons related to patentability.  *Id.* at 736-37.  Such narrowing creates a presumption "that the patentee surrendered all subject matter between the broader and the narrower language." *Id.* at 740.  Further, a "rejection [(on patentability grounds)] indicates that the patent examiner does not believe the original claim could be patented" and an applicant's submission of "an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim." *Id.* at 734.  Although *Festo* addresses the doctrine of equivalents, the same underlying principle, *i.e.*, that patentees cannot reclaim surrendered subject matter, applies with equal force in claim construction.  *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 978-79 (Fed. Cir. 1999) (applicant amended claims to distinguish prior art and the Federal Circuit held that these statements restricted the claims to that structure).

*Second*, the doctrine of prosecution history disclaimer overcomes the "heavy presumption that claim terms carry their fully ordinary and customary meaning" and requires courts to adopt a narrowed claim construction where the patentee has made "a clear and unmistakable disavowal during prosecution" of claim scope.  *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095-96 (Fed. Cir. 2013).   Disclaimer attaches when the patentee, through argument or

4

amendment, "unequivocally disavowed a certain meaning to obtain his patent." *Omega Eng'g,* 334 F.3d at 1324. Courts routinely find disclaimer where the applicant distinguishes prior art by emphasizing that the claimed invention requires a particular feature or excludes certain approaches. *See, e.g.*, *Biogen*, 713 F.3d at 1095-96 (finding disclaimer based on repeated prosecution arguments distinguishing prior art); S*peedTrack, Inc. v. Amazon.com, Inc.*, 998 F.3d 1373, 1379-80 (Fed. Cir. 2021) (prosecution disclaimer narrows "the ordinary meaning of a claim term" even where broader interpretations might otherwise be linguistically plausible).

*Third*, the prosecution history can affirmatively limit or override an otherwise broad or ordinary meaning even where a claim term may have a facially plausible plain and ordinary meaning. *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) (holding that "[a]lthough the construction of a claimed term is usually controlled by its ordinary meaning," the court "will adopt an alternative meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention."); *see also Iridescent Networks, Inc. v. AT&T Mobility, LLC,* 933 F.3d 1345, 1350, 1352-53 (Fed. Cir. 2019) (while the patentee argued that there was no clear disavowal of claim scope, the court disagreed and narrowly construed the disputed term, "*explain[ing] that any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to capture the scope of the actual invention that is disclosed, described, and patented.*")(emphasis added).; *see Acufloor, LLC v. EvenTile, Inc.*, 2025 WL 1513766, at *7 (Fed. Cir. May 28, 2025) (quoting *Phillips*, 415 F.3d at 1317) (The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention . . . making the claim scope narrower than it would otherwise be.")

Courts may also consider "extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (citations omitted). Such extrinsic evidence is particularly appropriate for use in the claim construction process where it helps the court "to better understand the underlying technology and the way in which one of skill in the art might use the claim terms." *Id*. at 1318 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)).

## IV.    TERMS FOR CONSTRUCTION

### A.    "a lipid component"

| Term | Plaintiff's Proposed Construction | Alnylam's Proposed Construction |
|---|---|---|
| "a lipid component" (claims 1, 2) | "one or more lipid components" | "all of the lipids present in the liposome" |

Alnylam's proposed construction for "a lipid component" comports with its use in the claims, specification, and prosecution history, and provides clarity that all of the lipids present in the liposome are necessarily part of the lipid component.   In contrast, Plaintiff's construction does not explain how a POSA would determine the scope of the term in the context of the patent, leaving the term without objective boundaries or meaningful guidance.

"Claim construction begins with the language of the claims themselves." *Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, 805 F.3d 1102, 1108 (Fed. Cir. 2015) (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). Claims 1 and 2 are directed to a pharmaceutical composition that contains two components: (1) a "short inhibitory ribonucleic acid (siRNA) component" and (2) a "lipid component" that forms a liposome:

> (b) *a lipid component* comprising a phospholipid component consisting of one or
> more   neutral   phospholipids   selected   from   the   group   consisting   of   a

6

phosphatidylcholine or a phosphatidylethanolamine phospholipid, wherein the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine and further wherein the lipid component has a neutral charge;

wherein <u>the lipid component forms a liposome</u> that encapsulate [sic] the siRNA

'717 Patent, Claims 1 and 2 (emphasis added); Dowdy Decl., ¶35. The claim language requires that the lipid component forms the liposome that encapsulates the siRNA component. *Id.* Because the claim expressly defines the liposome as being formed by the lipid component, the lipids in the liposome necessarily are the lipids in the lipid component. There is no claim language suggesting that lipids could be present in the lipid component but not in the liposome, or that lipids could be present in the liposome but not in the lipid component.

The specification supports that the liposome forms from all of the lipids in the lipid component. For example, "[i]n certain aspects the lipid component may be in the form of a liposome." '717 Patent, 2:31-32. Similarly, the specification states "[w]here clinical application of non-charged lipid component (*e.g.*, in the form of a liposome) containing a siNA is undertaken … ." '717 Patent, 24:51-53. These specification sections confirm what is claimed in the Asserted Claims – a neutral lipid component that forms a liposome to encapsulate siRNA. In doing so, the specification shows that the liposome is formed from the lipid component and that the lipid component is in the form of the liposome, *i.e.*, contains those lipids. Dowdy Decl., ¶35.

The prosecution history comports with Alnylam's proposed construction. As originally drafted, the claims did not refer to a lipid component. '717 Patent Prosecution History (Ex. 3), 96 (Oct. 15, 2007, Claims). In a subsequent amendment, Plaintiff replaced the phrase "a phospholipid component" with "a lipid component comprising one or more phospholipids." Ex. 3, 760 (March 2, 2011 Office Action Response). In its Remarks on the amendment, Plaintiff stated "Claim 1 has been amended to make it absolutely clear that that the <u>entire lipid component of the composition</u> is required to have an essentially neutral charge." *Id.*, 764. This language confirms Alnylam's

7

construction because Plaintiff amended the claims and expressly stated that the change was made to make "absolutely clear" that the entire lipid component of the composition, not merely a subset, must satisfy the charge limitation. Alnylam's construction is supported by the claims, the specification, and the prosecution history. Plaintiff's construction provides no guidance to the Court or to a jury and does not reflect the proper scope reflected in the intrinsic record.

### B. "a phospholipid component"

| Term | Plaintiff's Proposed Construction | Alnylam's Proposed Construction |
|---|---|---|
| "a phospholipid component" (claims 1, 2) | "one or more phospholipid components" | "all of the phospholipids present in the liposome" |

Alnylam's proposed construction of "a phospholipid component" comports with its use in the intrinsic record, whereas Plaintiff's proposed construction does nothing to define the term.

As *Philips* makes clear, the claim language provides the most clarity regarding claim meaning. 415 F.3d at 317. Claims 1 and 2 state:

> (b) a lipid component comprising *a phospholipid component consisting of* one or more neutral phospholipids selected from the group consisting of a phosphatidylcholine or a phosphatidylethanolamine phospholipid, wherein the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine and further wherein the lipid component has a neutral charge;

'717 Patent, Claims 1 and 2 (emphasis added).

The claim language uses the closed transition of "consisting of" following "a phospholipid component." When used, as here, in the body of a claim, "consisting of" limits "the clause for which it acts as a transition to only those elements found in that particular clause." *Digene Corp. v. Third Wave Techs., Inc.*, 323 F. App'x 902, 909 (Fed. Cir. 2009). Applying that to claims 1 and 2, the "consisting of" closed transition requires that phospholipid component is limited to "one or more neutral phospholipids selected from the group consisting of a phosphatidylcholine or a phosphatidylethanolamine phospholipid, wherein the phospholipid is not a

lysophosphatidylcholine or lysophosphatidylethanolamine," *i.e.*, there can be no other phospholipids present in the phospholipid component. Dowdy Decl., ¶36. As the claim further requires that the lipid component (comprising the phospholipid component) forms the liposome, it means that the liposome cannot contain any phospholipids that are not part of the phospholipid component.

Plaintiff's prosecution statements are consistent with this understanding of "consisting of" being a closed transition that limits "a phospholipid component" and show that Plaintiff intended the term to encompass all of the phospholipids present. *See Acufloor,* 2025 WL 1513766, at *7; ); *Iridescent Networks*, 933 F.3d at 1352–53. Specifically, Plaintiff unequivocally stated:

> So, the claim specifically limits the types of lipids and phospholipids that can be present. *Accordingly, the Examiner's statement that the claim is open to other phospholipids is simply incorrect*, *in that with respect to the phospholipids, the claim uses the 'consists' format.* And, while it is true that the claim is open to other lipids that are not the specified phospholipids, those other lipids must be neutral in charge.

Ex. 3, 940 (Nov. 14, 2011 Final Office Action Response)(emphasis added). This language confirms that "a phospholipid component" includes all the phospholipids present in the liposome, because the liposome is formed from the lipid component and the use of a closed transition for the phospholipid component inherently limits what can be included in the phospholipid component, and thus the liposome.

As with "a lipid component," Alnylam's proposed construction of "a phospholipid component" is true to the intrinsic evidence. Plaintiff's proposed construction offers no meaningful construction as it merely repeats the claim language without stating what it considers the ordinary and customary meaning of the language to a POSA and ignores its own prosecution statements that define the scope of the term.

9

C.    **"the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine"**

| Term | Plaintiff's Proposed Construction | Alnylam's Proposed Construction |
|---|---|---|
| "the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine" (claims 1, 2) | Plain-and-ordinary meaning, no construction necessary | "the phospholipid component contains no lysophosphatidylcholine or lysophosphatidylethanolamine" |

Alnylam's proposed construction of "the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine" is consistent with both the ordinary and customary meaning of the term and the disavowal of scope made during prosecution. By contrast, Plaintiff has refused to agree to Alnylam's proposed construction or offer one of its own, leaving both Alnylam and the Court without guidance as to what Plaintiff contends this term means.

Starting with the claim language, Claims 1 and 2 state:

(b) a lipid component comprising *a phospholipid component* consisting of one or more neutral phospholipids selected from the group consisting of a phosphatidylcholine or a phosphatidylethanolamine phospholipid, *wherein the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine* and further wherein the lipid component has a neutral charge;

'717 Patent, Claims 1 and 2 (emphasis added). Because the phospholipid component, as discussed above, necessarily includes all phospholipids present, the claim language excluding lysophosphatidylcholine and lysophosphatidylethanolamine applies to the entire phospholipid population.[4] This plain reading of the claim language supports Alnylam's proposed construction that lysophosphatidylcholine and lysophosphatidylethanolamine cannot be present in the phospholipid component.

---

[4] As the specification discloses, both lysophosphatidylcholine and lysophosphatidylethanolamine are phospholipids, and lysophosphatidylcholine is a phosphatidylcholine, while lysophosphatidylethanolamine is a phosphatidylethanolamine. '717 Patent, 2:43-66; *see also* Dowdy Decl., ¶37.

The doctrine of prosecution history estoppel confirms this reading. *See* Section III, *supra*. During prosecution, Plaintiff plainly gave up claim scope to overcome a rejection, which, in turn, must guide the proper construction of this term. *Festo*, 535 U.S. at 733. As originally drafted, independent Claim 1 was directed to "one or more phospholipids," and dependent Claim 6 provided an enumerated list of phospholipids, including both lysophosphatidylcholine and lysophosphatidylethanolamine. *See* Ex. 3, 96 (Oct. 15, 2007 Claims). The Examiner subsequently rejected the claims over Fahr under 35 U.S.C. § 102, stating that "Fahr claims a composition comprising siRNA and a neutral lipid (Claims 1, 14, and 15).[5] Lysophosphatidylehtanolamine and lysophosphatidylcholine are disclosed as a suitable lipid." Ex. 3, 797 (April 1, 2011 Office Action).

In response Plaintiff amended Claim 1 to reflect the current claim language of "the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine" and deleted both lysophosphatidylcholine and lysophosphatidylethanolamine from then dependent Claim 7. Ex. 3, 820-21 (July 12, 2011 Office Action Response). Plaintiff represented to the Examiner:

> With respect to Fahr, Applicants note that Fahr specifically requires the inclusion of lysophosphatides *that are now specifically excluded by the claims*; further, the claims now require that the phospholipid component be exclusively composed of a phosphatidlyethanolamine and/or a phosphatidylcholine and be comprised in a lipid component having a net neutral charge. Taken with the negative limitation, *the claims now <u>exclude</u> the use of lysophosphatides*, a key component and a requirement of the Fahr disclosure (see, e.g., first paragraph of Brief Summary of the Invention section). Thus, the claims are now novel with respect to Fahr.

*Id*., 827 (emphasis added). Plaintiff's remarks unambiguously and unmistakably exclude lysophosphatidylcholine and lysophosphatidylethanolamine from being present in the phospholipid component. This surrender of scope is reiterated later in the prosecution history,

---

[5] There was a series of claim amendments prior to this rejection that affected the claim numbering, but not the content as relevant to this term.

where Plaintiff states, "[w]e draw the Examiner's attention to the fact that claim 1 specifies 1) that any phospholipids present must 'consist' of either a phosphatidylcholine or a phosphotidylethanolamine, 2) *that the phopholipid [sic] component <u>must be free of</u> a lysophosphatidylcholine or lysophosphatidylethanolamine . . .* " Ex. 3, 939-40 (Nov. 14, 2011 Final OA Response) (emphasis added). Plaintiff surrendered that claim scope to overcome a prior art rejection, and any attempt to recapture such subject matter must fail in light of *Festo*.

Alnylam's proposed construction comports with both the plain meaning of the term and the scope Plaintiff surrendered to gain allowance of the patent. It would be improper for Plaintiff to assert the allowed claims while attempting to avoid the clear scope established during prosecution by contending that "no construction is necessary."

### D.    "a neutral charge"

| Term | Plaintiff's Proposed Construction | Alnylam's Proposed Construction |
|---|---|---|
| "a neutral charge" (claims 1, 2) | Plain and ordinary meaning, which is "a net charge of about zero" | "no net charge" |

Alnylam's construction of "a neutral charge" reflects the intrinsic record, whereas Plaintiff's construction improperly attempts to reclaim scope given up during prosecution. Specifically, during prosecution Plaintiff narrowed the term "essentially neutral charge" to a "neutral charge" to gain the patent's allowance. Plaintiff cannot reclaim that original scope through its construction of "a net charge of *about* zero."

The claim language itself is clear. Claims 1 and 2 do not state that the neutral charge is "about neutral," but instead state that it is a "neutral charge." While the specification provides no definition for "a neutral charge," a term that only appears in the claims, it does clearly define "essentially neutral":

> "Neutral liposomes or lipid composition" or "non-charged liposomes or lipid composition," as used herein, are defined as liposomes or lipid compositions having one or more lipids that yield an essentially-neutral, net charge (substantially non-charged). By "essentially neutral" or "essentially non-charged", it is meant that few, if any, lipids within a given population (e.g., a population of liposomes) include a charge that is not canceled by an opposite charge of another component (e.g., fewer than 10% of components include a non-canceled charge, more preferably fewer than 5%, and most preferably fewer than 1%).

'717 Patent, 13:5-15.

Thus, if "essentially neutral" permits "few, if any lipids within a given population (*e.g.*, a population of liposomes) [that] include a charge that is not cancelled by an opposite charge," then a neutral charge permits no lipids with a non-cancelled charge. Dowdy Decl., ¶38. Plaintiff's construction attempts to obfuscate this difference by adding, the term "about," which results in similar breadth conveyed by the term "essentially."

The prosecution history here exhibits the surrender of claim scope and estoppel described in *Festo* that confirms Alnylam's proposed construction. Legal Section (III), *supra*. The claims, as originally filed, stated "wherein the lipid component has *an essentially neutral charge*." Ex. 3, 96 (Oct. 15, 2007 Claims). The Examiner rejected the claims under 35 U.S.C. § 103, stating that "Harvie teaches a composition comprising a drug and a lipid component comprising one or more phospholipids, wherein the lipid component is essentially neutral charge." Ex. 3, 569 (Sept. 3, 2010 Non-Final Rejection). Plaintiff argued that the Examiner misconstrued the liposome in Harvie. Ex. 3, 604 (Nov. 9, 2010 Remarks). The Examiner found the Plaintiff's argument unpersuasive because "the claimed invention only requires a phospholipid component having around a neutral charge." Ex. 3, 739 (Jan. 7, 2011 Final Rejection).

In a subsequent Final Rejection, the Examiner made clear that "essentially neutral" means "around a neutral charge" or "about a neutral charge" – the very construction Plaintiff now advances for neutral charge. *Id.*, 741 ("wherein one or more phospholipid has *an essentially*

13

*neutral charge*, wherein *the charge of the phospholipid is <u>about</u> a neutral charge*.").  The Examiner remained steadfast that the art disclosed essentially neutral lipid components, stating that the essentially neutral term "does not limit the phospholipid component to only neutral phospholipids." Ex. 3, 915-16 (Oct. 13, 2011 Final Rejection) (emphasis added)

As a result of the Examiner's prior art rejection, Plaintiff narrowed the claims, removing "an essentially neutral charge" in favor of "a neutral charge":

1.    (Currently amended)  A composition comprising:

(a)    a short inhibitory ribonucleic acid (siRNA) component comprising one or more siRNA, wherein the siRNA has a backbone moiety that is negatively charged; and

(b)    a lipid component comprising a phospholipid component consisting of one or more neutral phospholipids selected from the group consisting of a phosphatidylcholine or a phosphatidylethanolamine phospholipid, wherein the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine and further wherein the lipid component has ~~an essentially~~ a neutral charge.

Ex. 3, 935 (Nov. 14, 2011 Final OA Response). Plaintiff stated "amended claim 1 now requires that the lipid component *have a neutral charge as opposed to an essentially neutral charge.*  So, the claim specifically limits the types of lipids and phospholipids that can be present."  *Id.,* 939-40.  The Plaintiff's Remarks also stated that "[m]oreover, the claim requires that the lipid component itself be neutral."  *Id.,* 941.  Plaintiff's narrowing language is clear – the lipid component must be neutral – not about neutral – but actually neutral as claimed.

Plaintiff maintained this same surrender on appeal to the Patent and Trials Board ("PTAB"), relying on the same amended claims that do not contain "essentially," stating: "So, to meet the limitations of the claims on appeal, both the phospholipid component and *the overall lipid component must be neutral . . . We contend that the claim clearly specifies that the lipid component*

14

*must be neutral in charge <u>and is not open to the inclusion of positively charged lipids</u>.*"  Ex. 3, 1135 (March 13, 2012 Reply Brief) (emphasis added).

Plaintiff initially sought to claim "essentially neutral" lipid components, which the Examiner repeatedly rejected over the prior art, causing the Plaintiff to narrow its claims to "a neutral charge."  In light of *Festo*, the claims cannot be construed to include subject matter that is "essentially neutral" in charge but not "neutral" in charge.  Plaintiff's construction fails because it attempts to claw back the surrendered claim scope by including "about," which is synonymous and serves the same broadening function as "essentially."

### E.    "liposome"

| Term | Plaintiff's Proposed Construction | Alnylam's Proposed Construction |
|---|---|---|
| "liposome" (claims 1, 2) | "a lipid vehicle that is a type of nanoparticle" | "a lipid vehicle having one or more lipid bilayers or aggregates surrounding an inner aqueous medium" |

As of the priority date of the '717 Patent, the term "liposome" had a well-known, ordinary and customary meaning in the art, which is reflected in Alnylam's proposed construction.  The use of "liposome" in the Asserted Claims comports with this meaning, whereas Plaintiff's proposed construction does not meaningfully construe the term or provide guidance as to its scope.

### 1.    <u>The Ordinary and Customary Meaning of "Liposome"</u>

As discussed in the Background section, *supra*, a POSA as of the priority date would have understood what a liposome was – namely, a structure composed of a certain class of lipids, where the lipids self-assemble based on the way different portions of those lipids interact with water and contain an inner aqueous medium.  Dowdy Decl., ¶¶22-28.  As such, the ordinary and customary meaning of "liposome" is "a lipid vehicle having one or more lipid bilayers or aggregates surrounding an inner aqueous medium."  Dowdy Decl., §VI(E)(I).

15

### 2.  The Use of "Liposome" in the '717 Patent Comports with the Ordinary and Customary Meaning

The use of "liposome" in both the claims and the specification of the '717 Patent is consistent with the ordinary and customary meaning of the term.

Beginning with the claim language, Claims 1 and 2 state:

(b) *a lipid component comprising a phospholipid component* consisting of one or more neutral phospholipids selected from the group consisting of a phosphatidylcholine or a phosphatidylethanolamine phospholipid, wherein the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine and further wherein the lipid component has a neutral charge;

*wherein the lipid component forms a liposome that encapsulate [sic] the siRNA*

'717 Patent, Claims 1 and 2 (emphasis added).  The claimed liposome, which encapsulates siRNA, is formed from the lipid component, which in turn comprises the phospholipid component.  To a POSA reading these claims, the term "liposome" would have its ordinary and customary meaning as discussed above, comprising amphoteric phospholipids lipids that form into a liposome, *i.e.*, a lipid vehicle having one or more lipid bilayers or aggregates surrounding an inner aqueous medium.  Dowdy Decl., §VI(E)(I).

The specification's use of "liposome" is consistent with the ordinary and customary meaning.  For example, the specification offers the following explanation of what a liposome is:

"Liposome" is a generic term encompassing a variety of unilamellar, multilamellar, and multivesicular lipid vehicles formed by the generation of enclosed lipid bilayers or aggregates.  *Liposomes may be characterized as having vesicular structures with a phospholipid bilayer membrane and an inner aqueous medium*.  Multilamellar liposomes have multiple lipid layers separated by aqueous medium.  They form spontaneously when phospholipids are suspended in an excess of aqueous solution.  *The lipid components undergo self-rearrangement before the formation of closed structures and entrap water and dissolved solutes between the lipid bilayers* (Ghosh and Bachhawat, 1991).  However, the present invention also encompasses compositions that have different structures in solution than the normal vesicular structure.  For example, the lipids may assume a micellar structure or merely exist as non-uniform aggregates of lipid molecules.  Also contemplated are lipofectamine-nucleic acid complexes.

16

'717 Patent, 12:34-51 (emphasis added).  The specification also makes other references to the liposome having a lipid bilayer and aqueous core.  *See* '717 Patent, 12:8-19 ("The present invention provides methods and compositions for associating an inhibitory nucleic acid, such as a siNA (e.g., a siRNA) with a lipid and/or liposome.  The siNA may be encapsulated in the aqueous interior of a liposome, interspersed within the lipid bilayer of a liposome . . .).  These descriptions of liposomes are consistent with the ordinary and customary meaning of "liposome."   Dowdy Decl., ¶¶ 42-43.  The specification also provides a description of the self-assembly or aggregation that amphoteric lipids undergo to form liposomes.  '717 Patent, 14:43-60.

### 3.      Plaintiff's Proposed Construction Is Insufficient

The construction offered by Plaintiff is insufficient to provide a clear meaning for the term "liposome."  While it is technically correct that a liposome is nanomolecular in size and composed of lipids, this proposed construction does not actually provide meaning or context to the term. Dowdy Decl., §VI(E)(2).   There are many types of nanoparticles, which is simply a descriptor of the size of a molecule, not what it is.  Plaintiff's construction omits a key aspect of what a liposome is – a structure created by the organized self-assembly of amphoteric lipids.  Further, Plaintiff's proposed construction would effectively include every lipid composition, despite the fact the specification makes it clear that not all lipid components form liposomes.  *See* '717 Patent, 13:15-18 ("In certain embodiments of the present invention, a composition may be prepared wherein the lipid component of the composition is essentially neutral but is not in the form of liposomes."); '717 Patent, 13:30-33 ("It is also recognized that the above approach may be used to generate a neutral lipid composition wherein the lipid component of the composition is not in the form of liposomes."); Dowdy Decl., §VI(E)(2).  Plaintiff's construction must fail because it offers no clear or ascertainable scope for the term and would leave both the Court and the parties without a definite understanding of the claim's boundaries.

17

### F.    "encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA

| Term | Plaintiff's Proposed Construction | Alnylam's Proposed Construction |
|---|---|---|
| "encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA" (claims 1, 2) | Plain-and-ordinary meaning, no construction necessary | "such that at least 90% of the siRNA is encapsulated" |

Plaintiff's refusal to offer a construction for this term directly contradicts the intrinsic evidence it created during prosecution, where it repeatedly and unequivocally advanced the construction that Alnylam now proposes. While a claim term is normally afforded its ordinary and customary meaning, here, where Plaintiff's allowance was based on statements that contradict or clarify that plain meaning, the only proper result is for the term to be construed consistent with the meaning advanced during prosecution.[6]

The dispute here is whether the 90% limitation ties to the percent of liposomes that encapsulate some siRNA or the percent of siRNA that has been encapsulated. *See* Dowdy Decl., ¶¶48-50. The second measure - percent of siRNA encapsulated - was well-known in the art as "encapsulation efficiency. During the parties' meet and confer, Plaintiff confirmed that its "no construction necessary" position meant that 90% of the liposomes in the composition encapsulate siRNA. Gaede Decl., ¶9. But during prosecution, Plaintiff unequivocally advanced a different concept - "encapsulation efficiency" - to secure the patent's allowance over the prior art. Plaintiff repeatedly distinguished the claimed invention from the prior art to the Patent Office by contrasting

---

[6] As discussed in the Legal Standard (III), the prosecution history may overcome the ordinary and customary meaning of a claim term if there is a clear and unmistakable disavowal or modification of claim scope in the prosecution history. Such disavowal or modification need not be express, *e.g.*, the patentee states during prosecution "I disavow," to be operative. *See Iridescent Networks*, 933 F.3d at 1353 ("any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to capture the scope of the actual invention that is disclosed, described, and patented.")

its 90% encapsulation with prior art data reporting the percent of siRNA encapsulated, not the percent of liposomes that encapsulate.  In doing so, Plaintiff urged the Patent Office to apply a construction requiring that 90% of the siRNA be incorporated into the liposomes – not that 90% of the liposomes contain siRNA.

Specifically, the Examiner raised prior art rejections that rendered the then proposed claims invalid.   Plaintiff appealed to the Patent Trial and Appeal Board.  The Board affirmed on appeal, but on different grounds, designating it as "a new ground of rejection."  Ex. 3, 1167 (Feb. 4, 2014 Decision).

 On remand to the Examiner, Plaintiff sought to overcome the new ground of rejection by adding the claim language in dispute here, *i.e.*, "[W]herein the lipid component forms a liposome that encapsulate the siRNA such that greater than 90% of the liposomes encapsulate [the] siRNA…."  Ex. 3, 1200 (April 4, 2014 Request to Reopen Prosecution).

Plaintiff explained to the Examiner: "As can be seen, *claim 1 now specifies* that the siRNA is encapsulated in a liposome and *requires an encapsulation efficiency* of at least 90% . . . ." (Emphasis added).  *Id*., 1204.  To overcome the cited art, Plaintiff further stated that "one of skill in the art *would not expect to achieve a greater than 90% encapsulation efficiency* using an antisense RNA" and thus the subject matter of the amended claim was "indeed surprising and unexpected." *Id*., 1205 (emphasis added).

Plaintiff further submitted a declaration from inventor Dr. Lopez-Berestein with several references from the literature that addressed "encapsulation efficiency" and not whether 90% of the liposomes contained a nucleic acid.  Ex. 3, 1218 (March 20, 2014 Lopez-Berestein Dec); Dowdy Decl., ¶¶51-53.  Inventor Lopez -Berestein further relied on encapsulation efficiency by stating he served on an FDA Panel that "developed a consensus that an encapsulation efficiency

19

of over 90% for any given liposomal/nucleic acid product should be preferred for IND evaluation." *Id.*, 1219.

Plaintiff spent several pages of argument in its response explaining Dr. Lopez-Berestein's Declaration to the Examiner, contending that the prior art did not achieve a 90% encapsulation efficiency and that it was important to do so for FDA purposes, as the current claim language required. Ex. 3, 1205-13 (April 4, 2014 Request to Reopen Prosecution). Plaintiff concluded:

> Thus, in summary, *the claims now specify* that the siRNA be encapsulated at an efficiency of greater than 90%. We have shown that such an encapsulation efficiency was unexpected in the case of negatively charged backbone and neutral phospholipid, all as specific in the subject claims. We contend this is strong evidence of non-obviousness. Stated another way, we have shown that the combination of references cited by the Examiner *would not be expected to achieve a 90% encapsulation efficiency as required by the claims*, thus no *prima facie* rejection.

*Id.*, 1215 (emphasis added). The Examiner withdrew the rejection. Ex. 3, 1334 (April 14, 2014 Office Action). Having represented repeatedly that the claims "specify" and "require" at least 90% siRNA encapsulation efficiency, Plaintiff made unequivocal statements about the proper construction of the phrase "encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA." Stated another way, Plaintiff should not be permitted to advance clear statements of claim scope to secure the patent's allowance while proffering a different scope in this litigation.

## V.    CONCLUSION

For the reasons stated above, Alnylam respectfully requests that Court enter Alnylam's proposed claim constructions.

20

Date: April 23, 2026

Respectfully submitted,

*/s/ Sarah Chapin Columbia*
Sarah Chapin Columbia (SBN 550155)
Sarah J. Fischer (SBN 688878)
McDermott Will & Schulte LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
Tel.: (617) 535-4000
Fax: (617) 321-4656
scolumbia@mcdermottlaw.com
sjfischer@mcdermottlaw.com

William G. Gaede, III *(Admitted Pro Hac Vice)*
McDermott Will & Schulte LLP
415 Mission Street, Suite 5600
San Francisco, CA 94105
Tel.: (650) 815-7400
wgaede@mcdermottlaw.com

Mandy H. Kim *(Admitted Pro Hac Vice)*
McDermott Will & Schulte LLP
23 Corporate Plaza Drive, Suite 135
Newport Beach, CA 92660
Tel.: (949) 757-6061
mhkim@mcdermottlaw.com

*Attorneys for Defendants Alnylam*
*Pharmaceuticals Inc. and Alnylam U.S. Inc.*

21

**APPENDIX A**

The invention claimed is:

**1.** A pharmaceutical composition comprising:

(a) a short inhibitory ribonucleic acid (siRNA) component comprising one or more siRNA, wherein the siRNA has a backbone moiety that is negatively charged; and

(b) a lipid component comprising a phospholipid component consisting of one or more neutral phospholipids selected from the group consisting of a phosphatidylcholine or a phosphatidylethanolamine phospholipid, wherein the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine and further wherein the lipid component has a neutral charge;

wherein the lipid component forms a liposome that encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA, the siRNA is a double stranded nucleic acid of 18 to 100 nucleobases, and the liposome encapsulated siRNA is comprised in a pharmaceutically acceptable carrier, wherein the phospholipid component consists of DOPC.

**2.** A pharmaceutical composition comprising:

(a) a short inhibitory ribonucleic acid (siRNA) component comprising one or more siRNA, wherein the siRNA has a backbone moiety that is negatively charged; and

(b) a lipid component comprising a phospholipid component consisting of one or more neutral phospholipids selected from the group consisting of a phosphatidylcholine or a phosphatidylethanolamine phospholipid, wherein the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine and further wherein the lipid component has a neutral charge;

wherein the lipid component forms a liposome that encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA, the siRNA is a double stranded nucleic acid of 18 to 100 nucleobases, and the liposome encapsulated siRNA is comprised in a pharmaceutically acceptable carrier, wherein the phospholipid component consists of two or more types of neutral phospholipids.

**3.** The composition of claim **1** or **2**, wherein the siRNA inhibits the translation of a gene that promotes growth of a hyperplastic or cancerous mammalian cell.

1

**4.** A pharmaceutical composition comprising:

(a) a short inhibitory ribonucleic acid (siRNA) component comprising one or more siRNA, wherein the siRNA has a backbone moiety that is negatively charged; and

(b) a lipid component comprising a phospholipid component consisting of one or more neutral phospholipids selected from the group consisting of a phosphatidylcholine or a phosphatidylethanolamine phospholipid, wherein the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine and further wherein the lipid component has a neutral charge;

wherein the lipid component forms a liposome that encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA, the siRNA is a double stranded nucleic acid of 18 to 100 nucleobases, and the Iiposome encapsulated siRNA is comprised in a pharmaceutically acceptable carrier, wherein the siRNA inhibits the translation of a gene that promotes growth of a hyperplastic or cancerous mammalian cell and wherein the gene is EphA2.

**5.** A pharmaceutical composition comprising:

(a) a short inhibitory ribonucleic acid (siRNA) component comprising one or more siRNA, wherein the siRNA has a backbone moiety that is negatively charged; and

(b) a lipid component comprising a phospholipid component consisting of one or more neutral phospholipids selected from the group consisting of a phosphatidylcholine or a phosphatidylethanolamine phospholipid, wherein the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine and further wherein the lipid component has a neutral charge;

wherein the lipid component forms a liposome that encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA, the siRNA is a double stranded nucleic acid of 18 to 100 nucleobases, and the Iiposome encapsulated siRNA is comprised in a pharmaceutically acceptable carrier wherein the siRNA inhibits the translation of a gene that promotes growth of a hyperplastic or cancerous mammalian cell and wherein the gene is $\beta2$ adrenergic receptor ($\beta2$AR).

**6.** A pharmaceutical composition comprising:

(a) a short inhibitory ribonucleic acid (siRNA) component comprising one or more siRNA, wherein the siRNA has a backbone moiety that is negatively charged; and

(b) a lipid component comprising a phospholipid component consisting of one or more neutral phospholipids selected from the group consisting of a phosphatidylcholine or a

phosphatidylethanolamine phospholipid, wherein the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine and further wherein the lipid component has a neutral charge;

wherein the lipid component forms a liposome that encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA, the siRNA is a double stranded nucleic acid of 18 to 100 nucleobases, and the Iiposome encapsulated siRNA is comprised in a pharmaceutically acceptable carrier, wherein the siRNA inhibits the translation of a gene that promotes growth of a hyperplastic or cancerous mammalian cell and wherein the gene is focal adhesion kinase (FAK).

**7.** The composition of claim **6**, wherein the lipid component comprises DOPC.

**8.** The composition of claim **6**, wherein the siRNA component comprises SEQ ID NO:7, SEQ ID NO:8, SEQ ID NO:9, or SEQ ID NO: 10.

**9.** The composition of claim **4**, **6** or **5**, wherein the phospholipid component consists of one or more of egg phosphatidylcholine ("EPC"), dilauryloylphosphatidylcholine ("DLPC"), dimyristoylphosphatidylcholine ("DMPC"), dipalmitoylphosphatidylcholine ("DPPC"), distearoylphosphatidylcholine ("DSPC"), 1-myristoyl-2-palmitoyl phosphatidylcholine ("MPPC"), 1-palmitoyl-2-myristoyl phosphatidylcholine ("PMPC"), 1-palmitoyl-2-stearoyl phosphatidylcholine ("PSPC"), 1-stearoyl-2-palmitoyl phosphatidylcholine ("SPPC"), dimyristyl phosphatidylcholine ("DMPC"), 1,2-distearoyl-sn-glycero-3-phosphocholine ("DAPC"), 1,2-diarachidoyl-sn-glycero-3-phosphocholine ("DBPC"), 1,2-dieicosenoyl-sn-glycero-3-phosphocholine ("DEPC"), palmitoyloeoyl phosphatidylcholine ("POPC"), dilinoleoylphosphatidylcholine distearoylphophatidylethanolamine ("DSPE"), dimyristoyl phosphatidylethanolamine ("DMPE"), dipalmitoyl phosphatidylethanolamine ("DPPE"), palmitoyloeoyl phosphatidylethanolamine ("POPE"), dioleoylphosphatidylethanolamine ("DOPE") or dioleoylposphatidylcholine ("DOPC").

**10.** The composition of claim **1**, **2**, **4**, **6** or **5**, wherein the composition further comprises cholesterol or polyethyleneglycol (PEG).

**11.** The composition of claim **1**, **2**, **4**, **6** or **5**, wherein the siRNA is 18 to 30 nucleobases.

**12.** The composition of claim **1**, **2**, **4**, **6** or **5**, further comprising a chemotherapeutic agent.

\*    \*    \*    \*    \*

3

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing is being served via the Court's CM/ECF system on April 23, 2026, on all counsel of record who consent to electronic service.

By: */s/ Sarah Chapin Columbia*
Sarah Chapin Columbia