**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **THE BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ALNYLAM PHARMACEUTICALS INC. and ALNYLAM U.S., INC.,**<br><br>**Defendants.** | ) | **Civil Action No. 25-13865-BEM** |

**MEMORANDUM AND ORDER**

**MURPHY, J.**

Plaintiff The Board of Regents of the University of Texas System (the “University”) brought this suit accusing Defendants Alnylam Pharmaceuticals Inc. and Alnylam U.S., Inc. (collectively, “Alnylam”) of infringing U.S. Patent No. 8,895,717 (the “’717 Patent”). Before the Court now are the parties’ briefs on claim construction. The Court construes the six terms at issue as set forth below.

## I. Background

The ’717 Patent concerns the delivery of short interfering ribonucleic acid (“siRNA”) into human cells via neutral lipid compositions called liposomes, to help develop treatments for medical conditions such as cancer. ’717 Patent, Abstract.[1]

On December 12, 2024, the University brought suit against Alnylam in the United States District Court for the Western District of Texas, alleging that Alnylam’s drug, ONPATTRO,

[11] The ’717 Patent is located at Dkt. 1-1.

infringes the ’717 Patent. Dkt. 1. On December 15, 2025, the District Court for the Western District of Texas transferred the case to the District of Massachusetts. Dkt. 86. The case has now reached the claim construction stage. The parties filed claim construction briefs concerning the six claim terms in dispute, and the Court conducted a *Markman* hearing on July 20, 2026, at which the parties presented their proposed constructions.

## II. Legal Framework

The purpose of claim construction is to “determin[e] the meaning and scope of the patent claims asserted to be infringed.” *Markman v. Westview Instruments, Inc.* (*Markman I*), 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff’d*, 517 U.S. 370 (1996). The construction of claim terms is a question of law. *Markman v. Westview Instruments* (*Markman II*), 517 U.S. 370, 372 (1996) (“[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.”). “Claim terms are generally given their plain and ordinary meanings to one of skill in the art when read in the context of the specification and prosecution history.” *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2013). “There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution.” *Id.* (internal quotation marks and citation omitted).

“In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.” *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). “In construing claim terms, courts look to ‘the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of

the art.'" *3-D Matrix, Inc. v. Menicon Co.*, 2016 WL 111410, at *1 (D. Mass. Jan. 11, 2016) (quoting *Phillips*, 415 F.3d at 1314).

**A. Claim Language**

Claim construction begins with the language of the claims themselves, because "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted). "[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application." *Id.* at 1312–13 (internal quotation marks omitted). "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* at 1314; *see also id.* ("This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term."). For example, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* Additionally, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

**B. Specification**

The claims, however, "do not stand alone," but "are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* (citation and internal quotation marks omitted). A "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Therefore, "the specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (1996)). "The specification, as the patentee's description of the invention, defines 'the scope and outer boundary' of the claims and, thus, 'claims cannot be of broader scope than the invention that is set forth in the specification.'" *Actifio, Inc. v. Delphix Corp.*, 150 F. Supp. 3d 117, 120 (D. Mass. 2015) (quoting *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338–40 (Fed. Cir. 2006)).

"Nevertheless, the court must be careful to 'us[e] the specification [only] to interpret the meaning of a claim' and not to 'import[] limitations from the specification into the claim.'" *3-D Matrix*, 2016 WL 111410, at *2 (quoting *Phillips*, 415 F.3d at 1323); *see also Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). A patent's "claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). Although this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323. Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

### C. <u>Prosecution History</u>

Courts also consider the prosecution history, which consists of the record of the proceedings before the United States Patent and Trademark Office ("PTO") and prior art cited during the examination of the patent. *Id.* at 1323. The prosecution history can provide additional insight into how the inventor and the PTO understood the patent, which "can often inform the

meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317 (citing *Vitronics*, 90 F.3d at 1582–83). However, because the prosecution history "often lacks the clarity of the specification" it "thus is less useful for claim construction purposes." *Id.* (citations omitted). As a result, courts must "not rely on the prosecution history to construe the meaning of the claim to be narrower than it would otherwise be unless a patentee limited or surrendered claim scope through a clear and unmistakable disavowal." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1322 (Fed. Cir. 2013). That said, "when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013).[2]

**D. <u>Extrinsic Evidence</u>**

Finally, courts may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman I*, 52 F.3d at 980). Such evidence "can help educate the court regarding the field of the invention and can help the court determine

---

[2] Alnylam argues that the Court should also consider whether the University should be estopped from arguing certain claim constructions under the doctrine of "*Festo* estoppel," otherwise known as prosecution history estoppel. Dkt. 121 at 8, 15–17, 19. However, the Federal Circuit has made clear that the doctrine of "prosecution history estoppel" applies to an analysis of infringement under the doctrine of equivalents, not claim construction. *See Wenger Mfg., Inc. v. Coating Mach. 1 Sys., Inc.*, 239 F.3d 1225, 1238 (Fed. Cir. 2001) ("[T]he doctrine of prosecution history estoppel is 'irrelevant' to the determination of literal claim scope."); *see also Deerpoint Grp., Inc. v. Agrigenix, LLC*, 2022 WL 36963, at *8 (E.D. Cal. Jan. 3, 2022) (collecting cases and holding that "prosecution estoppel does not apply at this stage of the proceedings"). The Court notes, however, that the practical implications appear to be minimal in this case, as both doctrines consider whether statements made during patent prosecution result in certain claims constructions being surrendered. *See Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013) ("Though distinct, both doctrines serve to constrain the enforceable scope of patent claims commensurate with any subject matter surrendered during prosecution to obtain the patent, and a single action during prosecution can engender both a prosecution disclaimer and prosecution history estoppel.").

what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319. "[W]hile extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of the claim language," *id.* at 1317 (internal quotation marks and citation omitted), because extrinsic evidence suffers from several defects, including its independence from the patent, potential bias, and varying relevance, *see id.* at 1318–19; *see also V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) ("The intrinsic record in a patent case is the primary tool to supply the context for interpretation of disputed claim terms."). Therefore, it is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. Put simply, extrinsic evidence may not be used to "change the meaning of claims in derogation of the" intrinsic evidence. *Id.*

## III. Claim Construction

Claim 1 reads:

A pharmaceutical composition comprising:

> (a) a short inhibitory ribonucleic acid (siRNA) component comprising one or more siRNA, wherein the siRNA has a backbone moiety that is negatively charged; and
>
> (b) **a lipid component** comprising **a phospholipid component** consisting of one or more neutral phospholipids selected from the group consisting of a phosphatidyl choline or a phosphatidylethanolamine phospholipid, wherein **the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine** and further wherein the lipid component has **a neutral charge**;

wherein the lipid component forms a **liposome** that **encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA**, the siRNA is a double stranded nucleic acid of 18 to 100 nucleobases, and the **liposome** encapsulated siRNA is comprised in a pharmaceutically acceptable carrier, wherein the phospholipid component consists of DOPC.

'717 Patent at 75:42–59 (emphases added).

Claim 2 reads:

A pharmaceutical composition comprising:

(a) a short inhibitory ribonucleic acid (siRNA) component comprising one or more siRNA, wherein the siRNA has a backbone moiety that is negatively charged; and

(b) **a lipid component** comprising **a phospholipid component** consisting of one or more neutral phospholipids selected from the group consisting of a phosphatidylcholine or a phosphatidylethanolamine phospholipid, wherein **the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine** and further wherein the lipid component has **a neutral charge**;

wherein the lipid component forms a **liposome** that **encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA**, the siRNA is a double stranded nucleic acid of 18 to 100 nucleobases, and the **liposome** encapsulated siRNA is comprised in a pharmaceutically acceptable carrier, wherein the phospholipid component consists of two or more types of neutral phospholipids.

’717 Patent at 75:60–76:51 (emphases added).

For these two claims, the parties dispute the meaning of the following terms: “a lipid component,” “a phospholipid component,” “the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine,” “a neutral charge,” “liposome,” and “encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA.” The Court analyzes each in turn.

**A. <u>“a lipid component”</u>**

| The University’s Proposal | Alnylam’s Proposal | The Court’s Construction |
| --- | --- | --- |
| “one or more lipid components” | “all of the lipids present in the liposome” | “one or more lipids present in the liposome” |

Alnylam argues that the University’s definition provides no further clarity over the term as written, and that the term should be defined as “all of the lipids present in the liposome.” Dkt. 121 at 10. Alnylam points to language later in the claim, which states that “the lipid component forms a liposome that encapsulate[s] the siRNA.” ’717 Patent, Claims 1 and 2. According to Alnylam, “[b]ecause the claim expressly defines the liposome as being formed by the lipid component, the

lipids in the liposome necessarily are the lipids in the lipid component." Dkt. 121 at 11. Alnylam also contends that the University disclaimed scope during prosecution that the University's proposed construction now seeks to recapture. Dkt. 121 at 11–12.

Conversely, the University argues that the term "a lipid component" should be defined as "one or more lipid components," focusing predominantly on the use of the word "a" before the noun to argue that "phrase [must] be construed to mean 'one or more' unless the context sufficiently indicates otherwise." Dkt. 122 at 10 (quoting *ABS Glob., Inc. v. Cytonome/St, LLC*, 84 F.4th 1034, 1040 (Fed. Cir. 2023)). In further support, the University points to the specification, which states:

> The use of the word "a" or "an" when used in conjunction with the term "comprising" in the claims and/or the specification may mean "one," but it is also consistent with the meaning of "one or more," "at least one," and "one or more than one."

'717 Patent at 4:36–40.

The Court adopts neither of the proposed constructions. While the claim states that "the lipid component forms a liposome that encapsulate[s] the siRNA," '717 Patent, Claims 1 and 2, nothing in the intrinsic record precludes there being lipids in the liposome that are not included in the lipid component, *see In re Crish*, 393 F.3d 1253, 1257 (Fed. Cir. 2004) (interpreting the meaning of a claim using the transitional phrase "comprising" as requiring a specific portion of a nucleotide sequence but noting that "the earlier term 'comprising' means that the claim can include that portion plus other nucleotides").[3] As such, Alnylam's proposed construction is improper. *See Storage Tech. Corp. v. Cisco Sys.*, 329 F.3d 823, 831 (Fed. Cir. 2003) ("[I]nterpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation . . . which

[3] While *In re Crish*, 393 F.3d at 1256, applied the "broadest reasonable interpretation" standard for claims construction because that is the standard in front of the PTO, that distinction has no impact here.

is improper." (cleaned up)).[4] Nor do statements made during the patent's prosecution constitute disavowal. As Alnylam notes, Dkt. 121 at 11, the University told the PTO: "Claim 1 has been amended to make it absolutely clear that that the entire lipid component of the composition is required to have an essentially neutral charge," Dkt. 121-4 at 765. But that statement refers to the entire lipid *component*, not all lipids in the composition. That does not constitute a clear and unambiguous surrender of scope. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) (explaining that Federal Circuit caselaw "requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable" to apply the principles of prosecution disclaimer (cleaned up)).

However, that does not render the University's proposed construction sufficient. The University's construction conflicts with the later claim language that explains that "*the* lipid component forms a liposome," '717 Patent, Claims 1 and 2 (emphasis added), which seems to preclude multiple components from forming a liposome. That the specification recognizes the use of the word "a" *may* mean "one or more" is of little weight, given that the specification also expressly recognizes that "'a' . . . may mean 'one.'" *See* '717 Patent at 4:36–38. Accordingly, the Court adopts a modified version of the University's proposed construction: "one or more lipids present in the liposome," which addresses the deficiencies in both parties' constructions. This construction recognizes that there is no limitation in the claim language or patent that precludes the presence of additional lipids elsewhere in the liposome.

---

[4] Nor do Alnylam's citations to the specification require the construction they propose. *See* Dkt. 121 at 11. The specification notes that "[i]n certain aspects the lipid component may be in the form of a liposome." '717 Patent at 2:31–32. But the use of the phrase "in certain aspects" suggests that there are *other* aspects. *See 3-D Matrix*, 2016 WL 111410, at *2 ("[T]he court must be careful to 'us[e] the specification [only] to interpret the meaning of a claim' and not to 'import[] limitations from the specification into the claim.'" (quoting *Phillips*, 415 F.3d at 1323)); *see also Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

### B. <u>"a phospholipid component"</u>

| The University's Proposal | Alnylam's Proposal | The Court's Construction |
|---|---|---|
| "one or more phospholipid components"" | "all of the phospholipids present in the liposome" | "one or more phospholipids present in the liposome" |

Both parties largely reiterate the same arguments they made about the term "a lipid component," but add arguments regarding the claim's use of the phrase "consisting of." *See* Dkt. 121 at 12–13; Dkt. 122 at 10–14; Dkt. 126 at 9–12; Dkt. 127 at 14–15. For the reasons stated above, *see supra* Section III.A, and the additional reasons below, the Court will adopt a modified version of the University's proposed construction: "one or more phospholipids present in the liposome," which addresses the deficiencies in both parties' constructions.

Alnylam argues that the use of the phrase "consisting of" and statements made to the PTO "confirms that 'a phospholipid component' includes all the phospholipids present in the liposome, because the liposome is formed from the lipid component and the use of a closed transition for the phospholipid component inherently limits what can be included in the phospholipid component, and thus the liposome." Dkt. 121 at 13. But nothing in the use of the phrase "consisting of"—or any other language in the claim—requires that the only phospholipids in the liposome exist in the phospholipid component; it just limits what can make up the phospholipid component. *See Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1282 (Fed. Cir. 1986) ("The district court correctly observed that the phrase 'consisting of' appears in clause (a), not the preamble of the claim, and thus limits only the element set forth in clause (a). The court correctly declined to read this usage of 'consisting of' as excluding all other elements from the claim as a whole.").

Additionally, the Court does not find that the University disclaimed a broader scope during prosecution. Though the University represented to the PTO that "the Examiner's statement that

the claim is open to *other* phospholipids is simply incorrect, in that with respect to the phospholipids, the claim uses the 'consists' format," Dkt. 121-5 at 70 (emphasis in original), in the broader context of the statement, this appears to have referred to phospholipid component, rather than the claimed composition as a whole, *see id.* at 69–70 ("We draw the Examiner's attention to the fact that claim 1 specifies . . . that the *phopholipid* [sic] *component* must be free of a lysophosphatidylcholine or lysophosphatidylethanolamine." (emphasis added)). As such, they cannot constitute clear and unmistakable disavowal.

### C. "the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine"

| The University's Proposal | Alnylam's Proposal | The Court's Construction |
| --- | --- | --- |
| plain-and-ordinary meaning, no construction necessary | "the phospholipid component contains no lysophosphatidylcholine or lysophosphatidylethanolamin" | "the phospholipid component contains no lysophosphatidylcholine or lysophosphatidylethanolamin" |

The University argues that while this term requires that no lysophosphatidylcholine or lysophosphatidylethanolamine (collectively, "lysophosphatides") be selected for inclusion in the composition, this limitation does not "exclude [lysophosphatides] from the scope of all claims." Dkt. 126 at 15–16; *see also id.* ("The exclusion of lysophophatides [sic] (e.g., lysophosphatidylcholine or lysophosphatidylethanolamine) is that the *selected* phospholipid cannot include certain lysophophatides [sic]." (emphasis added)). Alnylam contends that the University's statements during prosecution "unambiguously and unmistakably exclude lysophosphatidylcholine and lysophosphatidylethanolamine from being present in the phospholipid component." Dkt. 121 at 15.

To distinguish its claims from prior art, the University explained to the PTO that: "Fahr specifically requires the inclusion of lysophosphatides that are now specifically excluded by the claims; . . . [t]aken with the negative limitation, the claims now exclude the use of

lysophosphatides, a key component and a requirement of the Fahr disclosure." Dkt. 121-4 at 828. Later, the University told the PTO that "claim 1 specifies 1) that any phospholipids present must 'consist' of either a phosphatidylcholine or a phosphotidylethanolamine, 2) that the phopholipid [sic] component must be free of a lysophosphatidylcholine or lysophosphatidylethanolamine. . . . So the claim specifically limits the types of lipids and phospholipids that can be present." Dkt. 121-5 at 69–70. These statements are clear and unequivocal. *See Biogen*, 713 F.3d at 1095 (noting that "a clear and unmistakable disavowal during prosecution overcomes the heavy presumption that claim terms carry their full ordinary and customary meaning" (internal quotation marks omitted).[5]

Alnylam also argues the University's proposed definition does not comport with the claim language, which defines the invention. Dkt. 127 at 14. The Court agrees, for substantially the reasons described by Alnylam. *See id.* A plain reading of the claim language bars the inclusion of lysophosphatides in the phospholipid component. Accordingly, the Court finds that the University's statements constitute disavowal and thus adopts Alnylam's proposed construction.

### D. "a neutral charge"

| The University's Proposal | Alnylam's Proposal | The Court's Construction |
|---|---|---|
| plain and ordinary meaning, which is "a net charge of about zero" | "no net charge" | plain and ordinary meaning; no construction necessary |

"A term needs no construction when 'the plain and ordinary meaning of the disputed claim language is clear.'" *Rasmussen Instruments, LLC v. DePuy Synthes Prods., Inc.*, 568 F. Supp. 3d 117, 124 (D. Mass. 2021) (quoting *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291

[5] As such, the University's arguments regarding claim differentiation, *see* Dkt. 126 at 15, fail, *see Biogen*, 713 F.3d at 1097 ("[W]here found, prosecution history disclaimer can overcome the presumption of claim differentiation." (citing *Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1375–76 (Fed. Cir. 2008))).

(Fed. Cir. 2015)). During oral arguments, it became clear that there was no meaningful dispute over the meaning of the term. Both parties agreed that there is no such thing as "absolute zero" and that "neutral charge" is a term of art that experts in the field readily understand. Dkt. 133 at 82–86. As such, the Court concludes that the claim term has its plain and ordinary meaning and that further construction is not warranted. *See Summit 6*, 802 F.3d at 1291 ("Because the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the claim term."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360–62 (Fed. Cir. 2008) ("When the parties raise an *actual dispute* regarding the proper scope of these claims, the court, not the jury, must resolve that dispute. . . . [But] district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims." (first emphasis added)).

In doing so, the Court rejects both parties' constructions. Because Alnylam concedes that neutral charge is not the same as absolute zero, *e.g.*, Dkt. 133 at 84, "no net charge" is not an appropriate construction. Meanwhile, the University's proposed construction "add[s] unnecessary language to a readily understandable term," *Sunrise Techs., Inc. v. Cimcon Lighting, Inc.*, 280 F. Supp. 3d 238, 244 (D. Mass. 2017) (citing *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1152 (Fed. Cir. 1997)), and would reclaim scope clearly given up during prosecution, *see, e.g.*, Dkt. 121-4 at 742 (rejection from PTO describing "essentially neutral" as meaning "around a neutral charge" or "about a neutral charge"); Dkt. 121-5 at 45 (rejection from PTO noting that the essentially neutral term "does not limit the phospholipid component to only neutral phospholipids"); *id.* at 65 (the University's claim amendment changing claim language from "essentially neutral charge" to "a neutral charge"). That the specification references "essentially neutral" does not expand the scope of the term "neutral," as courts "must give each claim term the respect that it is due." *Pause Tech.,*

*LLC v. TiVo, Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005). Accordingly, where the specification defines "essentially neutral" as "few, if any, lipids within a given population (e.g., a population of liposomes) include a charge that is not cancelled by an opposite charge of another component (e.g., fewer than 10% of components include a non-canceled charge, more preferably fewer than 5%, and most preferably fewer than 1%.")," '717 Patent at 13:5–15, "neutral" must be something less than this ten percent.[6] In rejecting both proposed constructions and concluding that the term has its plain and ordinary meaning, the Court resolves the dispute. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206–07 (Fed. Cir. 2010) ("The district court construed 'addressed to a client' as having 'its plain and ordinary meaning,' but also observed that 'the defendant's proposed construction would unjustifiably narrow the term's broad scope, which was not explicitly limited or redefined by the specification.' . . . Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction, which required an IP address." (quoting *Finjan Software, Ltd. v. Secure Computing Corp.*, No. 06-cv-369, Dkt. 142 at 1 & n.1 (D. Del. Dec. 11, 2007))).

### E. "liposome"

| The University's Proposal | Alnylam's Proposal | The Court's Construction |
|---|---|---|
| "a lipid vehicle that is a type of nanoparticle" | "a lipid vehicle having one or more lipid bilayers or aggregates surrounding an inner aqueous medium" | "a lipid vehicle having one or more lipid bilayers or aggregates surrounding an inner aqueous medium" |

At the heart of the parties' dispute is whether the patent requires liposomes to have an inner aqueous medium. Alnylam argues that it does, *see* Dkt. 121 at 19–21, while the University argues that the term covers other lipid-based structures that lack an aqueous center, such as micelles, *see*

[6] The Court notes that neither party has provided any basis for the Court to set forth a decision with more mathematical precision, nor does that seem appropriate given the parties agreed that was not necessary. *See* Dkt. 133 at 82:4–86:12.

Dkt. 122 at 19–23. There is little dispute that liposomes and micelles refer to different lipid vehicle structures. *See* Dkt. 133 at 87. The question is thus whether the University defined liposome more broadly in the patent itself, to sweep in micelles and other structures as well.[7]

The claims state that "the lipid component forms a liposome that encapsulate[s] the siRNA." '717 Patent, Claims 1 and 2. The specification teaches that:

> The liposome or liposome/siNA associated compositions of the present invention are not limited to any particular structure in solution. For example, they may be present in a bilayer structure, as micelles, or with a "collapsed" structure. They may also simply be interspersed in a solution, possibly forming aggregates which are not uniform in either size or shape.
>
> . . .
>
> "Liposome" is a generic term encompassing a variety of unilamellar, multilamellar, and multivesicular lipid vehicles formed by the generation of enclosed lipid bilayers or aggregates. Liposomes may be characterized as having vesicular structures with a phospholipid bilayer membrane and an inner aqueous medium. Multilamellar liposomes have multiple lipid layers separated by aqueous medium. They form spontaneously when phospholipids are suspended in an excess of aqueous solution. The lipid components undergo self-rearrangement before the formation of closed structures and entrap water and dissolved solutes between the lipid bilayers (Ghosh and Bachhawat, 1991). However, the present invention also encompasses compositions that have different structures in solution than the normal vesicular structure. For example, the lipids may assume a micellar structure or merely exist as non-uniform aggregates of lipid molecules.

'717 Patent at 12:18–24, 33–48. The specification also teaches that "[i]n certain embodiments of the present invention, a composition may be prepared wherein the lipid component of the composition is essentially neutral but is not in the form of liposomes." *Id.* at 13:15–18.

---

[7] The Court notes that no party has argued that lexicography applies.

Nothing in the specification teaches that the term "liposomes" includes "micelles." Instead, the specification merely teaches that the composition can also contain other structures.[8] Notably, the specification paragraph that defines "liposome" states that micelles are "lipids" that assume a "micellar structure," not that a micelle is, itself, a liposomal structure or are a liposome. *Id.* at 12:45–49.[9]

To the extent that there is doubt regarding this definition, the Court concludes that Alnylam's definition comports with the weight of extrinsic evidence, including that which was submitted by the University's own expert. *See, e.g.*, Dkt. 123-9 at 2, 3, 5 (referring to liposomes and micelles as distinct structures); Dkt. 123-11 at 4 (publication from the '717 Patent inventors distinguishing between liposomes, micelles, and other nanoparticles, and explaining that "[l]iposomes are uni- or multilamellar vehicles consisting of a phospholipid bilayer with hydrophilic and/or aqueous inner compartment"); Dkt. 123-12 at 4 ("Differently from micelle, in the liposomes both the internal and external regions are aqueous."). Accordingly, the Court adopts Alnylam's proposed construction.

### F. <u>"encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA"</u>

| The University's Proposal | Alnylam's Proposal | The Court's Construction |
| --- | --- | --- |
| plain and ordinary meaning, no construction necessary | "such that at least 90% of the siRNA is encapsulated" | plain and ordinary meaning, no construction necessary |

The Court will not construe this term. Alnylam does not dispute that the plain and ordinary meaning is clear, but instead argues that in order to "gain allowance for its pending claims, [the

[8] The Court further notes that the specification teaches that "the present invention also encompasses compositions that have different structures in solution than the normal vesicular structure," including "micellar structure[s]" and "collapsed structure[s]." '717 Patent at 12:18–22, 45–49. Nothing in this language expands the meaning of the term "liposome."

[9] Nor does the specification's use of the word "may" require a different result.

University] unequivocally proffered a different construction than what it now seeks from the Court." Dkt. 127 at 23. The Court disagrees. The specification explicitly teaches an embodiment (using a lipid referred to as DOPC) in which "greater than 90% of liposomes spontaneously incorporate fluorescent-tagged siRNA when microscopically examined for fluorescence."[10] '717 Patent at 35:32–34. This teaching is consistent with the plain language of the claim.

Alnylam argues that its proposed definition captures the concept of "encapsulation efficiency," which is the term that the University used during prosecution in various communications with the PTO. Dkt. 121 at 22. Alnylam points to certain statements made during prosecution, including: "As can be seen, claim 1 now specifies that the siRNA is encapsulated in a liposome and requires an encapsulation efficiency of at least 90%," Dkt. 121-5 at 334; "one of skill in the art would not expect to achieve a greater than 90% encapsulation efficiency using an antisense RNA," *id.* at 335; and "we have shown that the combination of references cited by the Examiner would not be expected to achieve a 90% encapsulation efficiency as required by the claims, thus no prima facie rejection," *id.* at 345.

But in that same letter to the PTO, the University explained that it amended the claims to add the language at issue, and "[s]upport for this limitation can be found at least at page 49, lines 15–17, of the specification." *Id.* at 334. That specification language is the same as that which appears in the '717 Patent. *Compare* Dkt. 121-4 at 63, *with* '717 Patent at 35:32–34. As such, it is not clear that the addition of this term was meant to capture Alnylam's definition of "encapsulation efficiency," as opposed to the plain language used in the claim and specification. *See Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (explaining that there is "a heavy presumption that claim terms carry their full ordinary and customary meaning,

[10] DOPC stands for 1,2-Dioleoyl-sn-Glycero-3-Phosphatidylcholine. '717 Patent at 35:15–16.

unless it can be shown the patentee expressly relinquished claim scope."); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) ("[W]e have . . . consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope."). In sum, the Court cannot say that the University "clearly and unmistakably" disavowed the plain meaning of this term. *Biogen*, 713 F.3d at 1095 (noting that only "a 'clear and unmistakable' disavowal during prosecution overcomes the heavy presumption that claim terms carry their full ordinary and customary meaning" (quoting *Omega*, 334 F.3d at 1323, 1326)).[11] Thus, the Court need not construe the term because, in concluding that the term has its plain and ordinary meaning, the Court has rejected Alnylam's construction and thereby resolved the parties' dispute.[12]

## IV. **Conclusion**

The disputed claim terms will be construed for the jury and for all other purposes in this litigation as follows:

1. the term "a lipid component" means "one or more lipids present in the liposome";
2. the term "a phospholipid component" means "one or more phospholipid present in the liposome";
3. the term "the phospholipid is not a lysophosphatidylcholine or lysophosphatidylethanolamine" means "the phospholipid component contains no lysophosphatidylcholine or lysophosphatidylethanolamine";

[11] While Alnylam points to its expert's declaration about the meaning of "encapsulation efficiency," *see, e.g.*, Dkt 121 at 22 (citing Dkt. 121-3 ¶¶ 48–50), "there is no need here to consult the extrinsic evidence, which cannot change the construction compelled by the intrinsic evidence," *St Case1tech, LLC v. Squires*, 2026 WL 456602, at *4 (Fed. Cir. Feb. 18, 2026); *see also Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022) ("Extrinsic evidence, we have observed, is generally 'less reliable; for claim construction purposes than the intrinsic record." (quoting *Phillips* 415 F.3d at 1318)).

[12] *See supra* Section III.D.

4. the term “a neutral charge” has its plain and ordinary meaning and no construction is necessary;
5. the term “liposome” means “a lipid vehicle having one or more lipid bilayers or aggregates surrounding an inner aqueous medium”; and
6. the term “encapsulate the siRNA such that greater than 90% of the liposomes encapsulate siRNA” has its plain and ordinary meaning and no construction is necessary.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: August 17, 2026